FILED
4/6/21 10:45 am
CLERK
U.S. BANKRUPTCY
COURT - WDPA

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| JONATHAN HAWRANKO, | : | Case No. 20-21513-TPA |
| *Debtor* | : | |
| | : | Chapter 7 |
| I.U.P.A.T. DISTRICT COUNCIL | : | |
| NO. 57 COMBINED FUNDS on | : | Consolidated at |
| behalf of the TRUSTEES OF THE | : | Adv. No. 20-02116-TPA |
| I.U.P.A.T. WELFARE FUND OF | : | |
| WESTERN PA AND THE I.U.P.A.T. | : | |
| WESTERN PA ANNUITY FUND AND | : | |
| THE INTERNATIONAL UNION OF | : | |
| PAINTERS AND ALLIED TRADES | : | Related to Doc. Nos. 4, 43, 49, 53, 91 |
| DISTRICT COUNCIL #57, | : | |
| *Plaintiff* | : | |
| | : | |
| v. | : | |
| | : | |
| JONATHAN HAWRANKO, | : | |
| WILLIAM ROETTER, and | : | |
| NIKOLAI J. BARLOW, | : | |
| *Defendants* | : | |

*Appearances:*  Maribeth Thomas, Counsel for the Plaintiffs
                Donald R. Calaiaro, Counsel for the Defendants

### **MEMORANDUM OPINION**

Before the Court for consideration are the ***Plaintiff's Motion for Summary Judgment***

***against Jonathan Hawranko and William Roetter*** ("Plaintiff's Motion") filed at  Doc. No. 43, and

the two, each entitled ***Defendant's Partial Motion for Summary Judgment*** ("Debtors' Motions") filed

1

at  Doc. Nos. 49 and 53.[1]  For the reasons set forth below the Court will grant the *Debtors' Motions*

and deny the *Plaintiff's Motion*, which will result in the entry of judgment in favor of the Debtors

and against the Plaintiff, based on the conclusion that the debt owed by the Debtors to the Plaintiff

is not excepted from discharge pursuant to *11 U.S.C. §523(a)(4)*.[2]


## PARTIES AND CLAIMS


The Plaintiff is the I.U.P.A.T. District Council No. 57 Combined Funds on behalf of

the Trustees of the I.U.P.A.T. Welfare Fund of Western Pa., the I.U.P.A.T. Annuity Fund

(collectively, "the Funds"), and the International Union of Painters and Allied Trades District Council

#57 ("Union").  As may be apparent from the name, Plaintiff represents union-related employee

benefit funds which were established under and are subject to the relevant provisions of the

Employees Retirement and Income Security Act ("ERISA"), *29 U.S.C. §1001, et. seq.*


The two Debtors are Jonathan Hawranko and William Roetter.  For several years

Hawranko and Roetter were the co-owners of a painting company called Roetters Painting, LLC ("the

Company") which entered into a collective bargaining agreement ("CBA")with the Union.  During

the period from 2016 through 2019 the Company failed to make certain employer contributions for

---

[1]

By order dated September 25, 2020, Adv. Nos. 20-2113 (Barlow), 20-2115 (Roetter), and
20-2116 (Hawranko) were all consolidated at this adversary number because all three involved the
same Plaintiff and similar legal and factual issues.  *See*, Doc. No. 19.  The matter involving Debtor
Nikolai Barlow (Bankruptcy Case No. 20-21542-JAD and Adv. No. 20-2113) was subsequently
resolved by way of a stipulated dismissal and is no longer pending. *See*, Doc. Nos. 69, 70.

[2]

The Court has jurisdiction over this matter pursuant to *28 U.S.C. §1334*.  This is a core
proceeding under *28 U.S.C. §157(b)((2) (I)*.

employee fringe benefits as required under the CBA.  The Plaintiff takes the position that the two

Debtors, in their capacity as owners and officers of the Company, have a responsibility to make good

on these unpaid Company contributions.  Plaintiff further argues that this responsibility is a debt that

is excepted from discharge under Section 523(a)(4) for defalcation while the Debtors were acting in

a fiduciary capacity.

The allegations against both Debtors are identical, with the amended complaints

against each being  broken down into two counts.  Count I relates to employee wage withholdings

taken by the Company during the period from December 2016 through December 2019 for "union

dues and legislative funds."   Under the CBA  those wage withholdings were then supposed to have

been paid over to the Funds by the Company, but they were not.  The total amount involved in Count

I is $11,720.45.   The amended complaints allege that by failing to ensure that these wage

withholdings were paid over to the Funds by the Company the Debtors committed a fraud or

defalcation and also conversion.  The Parties have stipulated that the Plaintiff is entitled to  judgment

as to Count I and the Court previously approved those stipulations in orders providing that debt in

the amount of $11,720.45 is excepted from discharge under *Section 523(a)(4)* as to each of the

Debtors.  *See*, Doc. Nos. 71, 72.  Thus, Count I has been resolved and is no longer at issue.

Count II remains in dispute.  It relates to fringe benefit contributions for medical and

annuity benefits that should have been paid by the Company to the Funds during the period from

December 2016 through December 2019 pursuant to the CBA (and certain "Trust Agreements"

related to the Funds, see discussion below) based on the number of hours worked by employees of

the Company, but which were not paid.  To be clear, these were <u>not</u> monies that were withheld from

3

employee wages by the Company and then not paid over, as in Count I.  The amount involved in

Count II appears to be in dispute.  Plaintiff alleges that there were $158,481 in such unpaid

contributions, and argues that with interest the amount due is roughly $170,000.  Plaintiff further

alleges that this amount should be excepted from discharge under *Section 523(a)(4)* based on the

Debtors' defalcation while acting in a fiduciary capacity.[3]

## *UNDISPUTED MATERIAL FACTS*

The Court relates the following facts as taken from the amended complaints and

answers, the statements of admitted fact filed by the Parties in connection with the *Motions*, and the

depositions of the Debtors which were attached to the *Plaintiff's Motion*.

Hawranko and Roetter went to high school together and graduated around 2004.  In

around 2014 they started working together in a painting business.  In 2015 the Company was formed

to operate the business, originally with Hawranko as a 30% owner and Roetter as a 70% owner.

Around 2015 when the CBA was signed (see below) that changed to a 50-50 ownership.  Roetter was

held out as the President of the Company and Hawranko as the Vice-President.  Throughout its

lifetime, management and control of the Company essentially rested only in the Debtors as a two-

man operation.  The Company had no office of its own and no clerical staff.  Hawranko, operating

out of his home, administered to the paperwork, billing and payroll for the Company, using

---

[3]

The amended complaints also alleged "fraud" by the Debtors under *Section 523(a)(4)* as an alternative ground of relief in Count II.  At the oral argument on the *Motions* the Plaintiff acknowledged there is no basis for a finding of fraud and indicated that it is relying solely on defalcation.

QuickBooks.  He would occasionally go to job sites to drop off materials.  Roetter was primarily out in the field on job sites doing the managing and scheduling of the painting jobs obtained by the Company and meeting with customers.  The Company went out of business in 2019.

From 2016 through 2019 the Company maintained a checking account at PNC Bank. Both Hawranko and Roetter were authorized to sign checks on the account and only one signature was required.  Hawranko and Roetter did not receive set salaries from the Company.  Instead, each would periodically withdraw funds from the PNC account that were designated as "guaranteed payments" for QuickBook purposes and those payments were their income.  The two Debtors took the following amounts of such payments from the Company:

|      | Hawranko | Roetter |
|------|------------|-------------|
| 2016 | $65,084.90 | $101,242.30 |
| 2017 | $39,068.58 | $ 92,465.37 |
| 2018 | $31,273.96 | $ 95,373.73 |
| 2019 | $28,994.79 | $ 92,939.34 |
|      | $164,422.23 | $382,020.74 |

There was no agreement or "method" between Hawranko and Roetter as to the amount each could take out of the Company in these "guaranteed payments," though they would talk before a large amount was withdrawn.  No W-2 was ever issued by the Company to either of them for these amounts.  Hawranko testified that "ideally" the two were planning to take withdrawals from the Company two times per month, but that did not always work out and he only took a withdrawal when there were funds available.

The Debtors' painting business had originally been a non-union operation. That changed on January 15, 2015. when Roetter signed the CBA as President of the Company, an event that was witnessed by Hawranko. The original CBA was in effect until May 31, 2017, and was then continued thereafter until the Company closed. The CBA required the Company to pay Union employees so much per hour, plus provide an additional amount of fringe benefits per hour. With respect to the fringe benefits, the CBA provided:

> Each employer working under this Agreement must contribute the sum ... for each hour worked or portion thereof, by all employees covered by this agreement. Such payment to be paid to the District Council 57 Insurance and Welfare Fund monthly...

*See*, June 1, 2017 through May 31, 2020, CBA at Art. IX, Section 1 (Exhibit A to amended complaint). There were also provisions in the CBA pursuant to which the Company agreed to be bound by and comply with the "Trust Agreements" that govern the Funds. Thus:

> All Employers signatory to this Agreement hereby agree to be bound by and comply with the Agreement and Declaration of Trust as though he/she had actually signed the same ...

*Id.* at Art. IX, Section 5. Furthermore:

> The payments to the Pension Fund required above shall be made to the I.U.P.A.T. Union and Industry Pension Fund, which was established under an Agreement and declaration of trust dated April 1, 1967. The Employer hereby agrees to be bound by and to the said Agreement and declaration of trust, as amended from time to time, as though he actually signed the same.

*Id.* at Art. X, Section 1. There are similar provisions for payments to the I.U.P.A.T. of Western Pa. Annuity Fund. *See, id.* at Art. XII, Section 1, 3.

6

The Court was not provided with complete copies of these "Trust Agreements," but portions of each are attached to the amended complaint as Exhibit B and of particular relevance here is the following provision contained in each:

> No contributing employer shall have any right, title or interest to any sum payable by such Employer to the Fund, but not yet paid into the Fund. Title to all monies paid into and/or due and owing such Fund shall be vested in the trustees of such Fund.

*See*, Article V, Section 3, Paragraph 3 of the Welfare Fund document and Appendix "A," Section 1, Paragraph (c) of the Annuity Fund document.

Under the CBA and the Trust Agreements the Company was required to submit monthly reports to the Funds showing the number of hours union employees of the Company worked in the preceding month and how much, in employer contributions, was therefore due to be paid to the Funds under the CBA based on those hours. Hawranko, with the knowledge of Roetter, prepared and submitted the reports each month, but no money was sent in with the reports – or at least not all the money that was required per the CBA although the record is a little fuzzy on that point. On September 30, 2019, the Funds filed a complaint in confession of judgment in the District Court against the Company over the failure to pay the benefits based on a "Judgment Note" the Company had signed on May 29, 2018.[4]  *See, I.U.P.A.T. District Council #57 Combined Funds v. Roetters*

---

[4]

The record is unclear as to why no legal action was taken by the Union and Funds concerning the missed payments until 2019. Both Hawranko and Roetter testified that they had ongoing conversations with representatives of the Union about problems the Company was having in making the contributions and the need to get more work for the Company to generate additional revenue. They further testified that the Union representatives indicated they would try to help with finding work for the Company, so that may explain the reason for the forbearance. Additionally, the execution of the Judgment Note in mid-2018 by the Company would seem to be indicative of ongoing concern and discussions about the missed payments.

*Painting, LLC*, Case No. 2:19-mc-01061.  On October 1, 2019, a default judgment was entered in favor of the Funds  in the amount of $133,710.92.  The Debtors filed their bankruptcy cases in May 2020.

### *SUMMARY JUDGMENT STANDARD*

The moving party on a summary judgment motion must establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed.R.Bankr.P. 7056*, incorporating *Fed.R.Civ.P. 56(a)*. "A factual dispute is 'genuine' if the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Razak v. Uber Techs., Inc*., 951 F.3d 137, 144 (3d Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, (1986)). "A factual dispute is 'material' if it 'might affect the outcome of the suit under the governing law.' " *Id*. (quoting *Anderson*, 477 U.S. at 248).

If the movant meets this initial burden  the opposing party must identify "specific facts which demonstrate that there exists a genuine issue for trial." *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317,  323 (1986)). The non-moving party cannot merely rest on allegations in pleadings in attempting to survive summary judgment, but rather  must respond "by pointing to sufficient cognizable evidence to create material issues of fact concerning every element as to which the nonmoving party will bear the burden of proof at trial." *Simpson v. Kay Jewelers, Div. of Sterling, Inc*., 142 F.3d 639, 643 n.3 (3d Cir. 1998).

Where cross-motions for summary judgment are filed, the court must rule on each motion on an individual and separate basis, determining for each whether a judgment may be entered

in accordance with the *Rule 56* standard. *Wintjen v. Denny's Inc.*, 2021 WL 734230, at *4 (W.D. Pa.

Feb. 25, 2021)

## *DISCUSSION*

Plaintiff argues that the Debtors were acting as fiduciaries to a technical or express

trust and committed defalcation in that capacity because they were in a position to ensure that the

Company paid the fringe benefit contributions to the Funds but failed to do so, while at the same time

themselves receiving payments from the Company.

Relying heavily upon the language from the Trust Agreements quoted above that

employers have no right, title or interest in sums payable to the Funds by the employer but not yet

paid, and that title to unpaid funds  is vested in the trustees of the Funds, Plaintiff asserts that means

the unpaid contributions were "plan assets" of the Funds.  Plaintiff further argues that Debtors

exercised discretionary control or authority over the unpaid contributions and were therefore

fiduciaries under ERISA.  *See*, *29 U.S.C. §1002(21)(A),* which provides that a person is a fiduciary

with respect to a plan to the extent he "exercises any authority or control respecting management or

disposition of [the plan's] assets."  According to Plaintiff, that means the Debtors were fiduciaries

for  purposes of *Section 523(a)(4)* as well, and that they breached their fiduciary duty by failing to

submit the contributions to the Funds.  Plaintiff acknowledges that defalcation under *Section

523(a)(4)* requires a showing of intentional conduct and believes  that standard has been met here

because the failure to pay was not the result of any error, but rather was a deliberate choice by the

Debtors.

The Debtors state that they are not seeking summary judgment on the issue of whether they committed defalcation, but only as to (1) whether they were acting in a fiduciary capacity with respect to the unpaid contributions, and (2) whether the unpaid contributions constitute "plan assets" as part of any trust. They argue that, even though they may have been considered fiduciaries for purposes of ERISA with respect to the unpaid contributions, fiduciary status for purposes of *Section 523(a)(4)* is a separate and narrower concept. They dispute that the language in the Trust Agreements creates a trust within the requirements of *Section 523(a)(4)* with respect to the unpaid contributions. They also argue that the unpaid contributions are not "plan assets" under ERISA and are therefore not part of any trust.

If the Plaintiff is correct on the fiduciary / plan asset issue, then the Court would still need to determine whether the Debtors engaged in defalcation before it could render a final judgment. However, if the Debtors are correct on the fiduciary / plan asset issue, then the defalcation issue becomes moot. For that reason, it makes sense to consider the fiduciary / plan asset issue first.

The Bankruptcy Code does not define the term "fiduciary," nor does ERISA define the term "plan asset." Both sides take the position that there is no binding Third Circuit authority on the specific question presented here of whether someone in the position of the Debtors vis-a-vis the unpaid employer contributions is acting in a fiduciary capacity for purposes of *Section 523(a)(4)*, an observation to which the Court agrees. In *Goldberg v. New Jersey Lawyers' Fund for Client Protection* 932 F.2d 273, 278 (3d Cir. 1991) the court commented that "[w]e recognize that some courts have considered that the criteria for establishing a 'fiduciary capacity' under *11 U.S.C. §523(a)(4)* are generally more narrow than those criteria comprising the broader meaning of fiduciary

10

as a relationship involving trust, good faith, and confidence." However, the *Goldberg* court did not

go beyond this passing comment to indicate whether or not it agreed with that view and in all the

subsequent years the Third Circuit does not seem to have ever revisited the question.

Turning next to district court opinions from the Western District, once again there is

no binding authority. Along the same line as the court in *Goldberg*, the court in *Chao v. Rizzi*, 2007

WL 2317335 fn. 4 (W.D. Pa., August 8, 2007) noted that "courts differ in their consideration of

whether ERISA fiduciary status is sufficient to create *Section 523(a)(4)* fiduciary status," but it did

not indicate its view on the matter because under the facts as presented, even assuming fiduciary

status, the plaintiff had not shown defalcation and the case was decided on that ground. Some general

guidance on applying *Section 523(a)(4)* was provided by the district court in *American Insurance Co.*

*v. Lucas*, 41 B.R. 923 (W.D. Pa. 1984). In that case the court cited with approval the discussion of

*Section 523(a)(4)* in *Collier on Bankruptcy*, 15th Edition, Section 523.14 to the effect that *Section*

*523(a)(4)* should be limited in its effect as to:

> "what may be described as technical or express trusts, and not to trusts
> ex maleficio that may be imposed because of the very act of
> wrongdoing out of which the contested debt arose ... this Court
> interprets the qualifying terms fiduciary duty under *Section 523(a)(4)*
> to require proof of a trust between the agent and principal before a
> debt due and owing between them can be found nondischargeable.

41 B.R. at 926.

This Court itself has never previously been presented with the specific question at

issue here, although it has had occasion to consider in general the test for finding fiduciary capacity

to exist for purposes of *Section 523(a)(4)*, and in so doing stated:

> The definition of 'fiduciary capacity' is a matter of federal law, which has consistently limited its scope to the capacity of one who holds property under either an express trust or ... a technical trust." "Although the necessary fiduciary relationship under §523(a)(4) is a question of federal law, state law determines the existence of a trust." ... "A technical trust is [commonly taken by courts today to mean] a trust imposed by state common law or statute."

*In re Jones*, 604 B.R. 443, 467 (Bankr. W.D. Pa. 2019) (quoting *In re Sabo*, 2005 WL 6761116 (Bankr. W.D. Pa., October 5, 2005)).

The debtor in *Jones* was found to have been acting in a fiduciary capacity, but the case involved a statutory trust created under New York law that had a clear res consisting of advance payments made to the debtor, so while of some guidance, its facts are clearly distinguishable from the present case. *See also, e.g., In re Kropp*, 2013 WL 6712984 (Bankr. W.D. Pa., December 18, 2013) ("... in the context of bankruptcy proceedings, 'fiduciary' is more narrowly defined than under common law"); *In re Deller*, 2009 WL 8556807 (Bankr. W.D. Pa., November 13, 2009) ("The concept of a fiduciary for purposes of *§523(a)(4)* is narrower than it is under other law ... One may qualify as a fiduciary under non-bankruptcy law without so qualifying under *§523(a)(4)*"); *In re Masdea*, 307 B.R. 466 (Bankr. W.D. Pa. 2004) (same). In order for an express or technical trust to exist four elements must be met: (1) an express intention to create a trust, (2) an ascertainable res, (3) a sufficiently certain beneficiary, and (4) a trustee who owns and administers the res for a beneficiary. *In re Verrone*, 277 B.R. 66, 72 (Bankr. W.D. Pa. 2002).

Thus, while the specific issue as to whether these Debtors were acting in a fiduciary capacity under *Section 523(a)(4)* with respect to the unpaid contributions owed to an ERISA plan is a question of first impression for this Court, the Court will not be writing on an entirely clear slate

because it is well-established that fiduciary status outside of the bankruptcy context does not *ipso facto* result in fiduciary status for purposes of *Section 523(a)(4)*. Put another way, even if the Debtors were fiduciaries within the ERISA definition of the term as found in *29 U.S.C. §1002(21)(A)*, that does not necessarily mean they were fiduciaries for present purposes.[5]    That is a matter for determination by the Court.

A central issue in making that determination is whether a trust was created as between the Debtors and the Funds, and if so the nature of such trust.  Plaintiff urges that there was a trust and points to the *unpaid contributions* as being the trust res rather than being  just simply unpaid debt. Plaintiff relies on the language from the Trust Agreements quoted earlier[6] in arguing that "fringe benefit contributions constitute assets of the Funds' before they are paid (*i.e.*, as accounts receivable").  *Plaintiff's Brief in Opposition to Defendants' Partial Motions for Summary Judgment* at p. 7, Doc. No. 79.  Even if  the Plaintiff were correct on that point, it is difficult to see how the Debtors  could then be considered fiduciaries under ERISA since an  employer that has no authority over management of the plan would have no control over enforcing such a right to payment of accounts receivable due the Funds, and lacking the requisite control over such plan asset would not qualify as a fiduciary for purposes of ERISA.  As it is, however, the Court finds that the Plaintiff is *not* correct.

---

[5]

In addition to the cases from this Court cited above for this concept, *see also*, for example, *In Re Harris*, 898 F.3d. 834, 843 (8th Cir. 2018) where the court stated that "[w]e have rejected 'the simple determination that an individual is an ERISA fiduciary is enough to satisfy the requirements of *§523(a)(4)*,'" (quoting *Hunter v. Philpott*, 373 F.3d 873 (8th Cir. 2004)).

[6]

"No contributing employer shall have any right, title or interest to any sum payable by such Employer to the Fund, but not yet paid into the Fund.  Title to all monies paid into and/or due and owing such Fund shall be vested in the trustees of such Fund."  *See* p. 6*, infra.*

The District Court has rendered a series of decisions (all outside of the bankruptcy context) concerning collective bargaining and employee benefit fund agreements with language very similar to the operative language at issue here.  For instance, in *Laborers Combined Funds of Western Pennsylvania v. Cioppa,* 346 F. Supp. 2d 765, 771 (W.D. Pa. 2004) the court construed the following language:

> No Employer obligated to pay contributions shall have any right, title or interest to any sum payable by such Employer to the Fund, but not yet paid into the Fund. Title to all monies paid into and/or due and owing the Fund shall be vested in the Fund and/or its Trustees.

346 F.Supp.2d at 768. This language is substantively indistinguishable from the language involved in the present case.  The *Cioppa* court found that this language was sufficient to render delinquent contribution payments as plan assets, though it did not go on to discuss <u>when</u> they became plan assets.[7]

In subsequent cases, however, the District Court did  address that question and the conclusion it reached – contrary to Plaintiff's position –  is that unpaid contributions become plan assets only upon becoming due.  In *Carpenters Combined Fund, Inc. by Klein v. Lucci,*  2017 WL 4023317  (W.D. Pa.,  Sept. 13, 2017) the court was faced with the identical language as in the *Cioppa* case, and it concluded that:

> ... the contributions owed were not simply receivables of the Funds if unpaid but instead became ERISA plan assets at the time these

---

[7]    In the absence of such language in a labor agreement it is generally held that unpaid contributions are not plan assets.  *See, e.g., In re Halpin*, 566 F.3d 286 (2d Cir. 2009).

> amounts became due ... Title to the fringe benefit contributions owed
> by CRS vested to the Funds when those fringe benefit contributions
> and the associated interest, liquidated damages, and attorneys' fees
> became due and owing, and they were plan assets within the meaning
> of ERISA.

Id. at *10.  Thus, the unpaid contributions were not plan assets until they became due and owing by

the Company under the CBA and Trust Agreements.  Similarly, in *Laborers' Combined Funds of*

*W. Pennsylvania v. Molinaro Corp.*, 234 F. Supp. 3d 660, 666 (W.D. Pa. 2017), again under very

similar contractual language, the court found that "the fringe benefit contributions at issue became

plan assets at the moment they became due."  *See also, Laborers' Combined Funds of Western*

*Pennsylvania v. Jennings*, 323 F.3d 511, 518-19 (W.D. Pa. 2018) ("... at the moment the benefit

contributions became due they were 'plan assets' under the plain language of the Trust

Agreements.").

The Court therefore finds that the unpaid contributions involved in the present case

are plan assets and became so at the time they became due under the Trust Agreements.

Furthermore, as to each such event this would have brought a trust res into existence and been a

trigger for the Debtors to thereafter be found as acting in a fiduciary capacity for purposes of ERISA

with respect to the unpaid contribution in question assuming they exercised the necessary authority

and control over it to meet the requirements of *29 U.S.C. §1002(21)(A)*.  As was indicated above,

however, fiduciary status under ERISA and under *Section 523(a)(4)* are not coextensive, with the

latter being narrower in scope.  In this particular instance, the Court recognizes that while the

Debtors may have been fiduciaries under ERISA in connection with the unpaid contributions, they

were not acting in a fiduciary capacity within the meaning of *Section 523(a)(4)*.  The reason for this

15

conclusion is that the Debtors would have only became ERISA fiduciaries by reason of the very act (or failure to act) that created the debt – the contribution not being paid by the Company.  It has long been a principle of bankruptcy law that the discharge exception for defalcation while acting in a fiduciary capacity does not extend to trusts that are created in that fashion.

This principle extends at least as far back as *Davis v. Aetna Acceptance Co.*, 293 U.S. 328 (1934)[8], wherein the Supreme Court, in construing a provision in the then-current bankruptcy law that was  in relevant respect the same as *Section 523(a)(4)*, stated:

> It is not enough that, by the very act of wrongdoing out of which the contested debt arose, the bankrupt has become chargeable as a trustee ex maleficio.  He must have been a trustee before the wrong and without reference thereto ... 'The language would seem to apply only to a debt created by a person *who was already a fiduciary when the debt was created*.' ...

*id*. at 333 (emphasis added).   The *Davis* court also cautioned that a mere label used by the parties does not create a fiduciary duty.  Rather, it is the substance of a relationship that is determinative. *Id*.

Based on the principle in *Davis* a number of courts have found that debtors in the same position as are the Debtors here were not acting in a fiduciary capacity when the company for which they were officers or shareholders failed to make employer contributions due under a collective bargaining agreement.  Thus, for example, the court in *In re Bucci*, 493 F.3d 635 (6th Cir.

---

[8]

In fact, in *Davis* itself the Court traced the principle all the way back to the case of  *Chapman v. Forsyth*, 2 How. 202, 11 L.Ed. 236 (1844) in which was construed a "like provision" in a bankruptcy act from 1841.

2007) rejected the same argument that Plaintiff is making here, stating:

> The Funds' argument illustrates the problem with treating a debtor's status as an ERISA fiduciary as alone being sufficient to create an express or technical trust for purposes of §523(a)(4). The act that created the debt – Bucci's breach of his contractual obligation to pay the employer contributions – is also the exercise of control that the Funds allege made Bucci an ERISA fiduciary. But for a trust relationship to satisfy §523(a)(4), the alleged fiduciary must have duties that preexist the act creating the debt.

*Id*. at 643 (citing *Davis*). And again:

> ... if an employer failing to pay contributions becomes an ERISA fiduciary only after the contributions are due, then the trust relationship springs from the act from which the debt arose. Such a trust relationship does not create an express or technical trust for purposes of §523(a)(4).

*Id*.[9]

The same conclusion was reached by the court in *Hunter v. Philpott*, *supra.* The debtor in *Hunter* was a 50% shareholder and officer of a company named Quality Home that had entered into a collective bargaining agreement with a union that required employer contributions to be made to certain funds. The court held that in the *Section 523(a)(4)* context the fiduciary

---

[9]

In its opinion the *Bucci* court noted that a statute may create a trust sufficient for purposes of *Section 523(a)(4)* if it defines the trust res, imposes duties on the trustee, and those duties exist prior to any act of wrongdoing. It cited as an example a Michigan statute that defined the trust res as all payments made to a contractor for the benefit of laborers, subcontractors , or materialmen and imposed duties on the contractor regarding those funds. (*See Jones, supra*, for a decision by this Court involving a similar statute under New York law). The *Bucci* court further noted that under the Michigan statute the fiduciary relationship was established when a payment was made to the contractor, not when the contractor misappropriated funds – thus imposing duties prior to any act of wrongdoing. ERISA, by contrast, does not impose a trust on the Debtors existing separate from the act of wrongdoing and independent of any contractual obligation to make a payment.

relationship must preexist the incident creating the contested debt and apart from it; it is not enough

for the trust relationship to spring from the act from which the debt arose.  373 F.3d at 877.  In

response to the argument that the debtor's fiduciary status was created by the collective bargaining

agreement, and thus preexisted the non-payment of the contributions, the court stated:

> It is necessary to look at the relationship between Philpott personally and the Funds, however, and not view Philpott simply as an alter ego of Quality Home. Philpott's debt to the Funds did not preexist the allegedly wrongful act complained of: that is, his failure to hold money to satisfy Quality Home's owed contributions. Any possible trust relationship between Philpott and the Funds could only have come into existence when he incurred some individual financial liability to the Funds. His personal liability arose at the time of Quality Home's failure to satisfy its obligations. Only then did he owe a duty to the Funds.  The only possible trust relationship therefore would have sprung from the wrongful act that created the financial liability. Application of §523(a)(4)'s exception to discharge under these circumstances would therefore violate the long-standing rule enunciated by the Supreme Court in *Davis*.

*Id*.  For other decisions employing the same reasoning and reaching the same result, *see also Bos*

*v. Bd. of Trustees*, 795 F3d 1006, 1011 (9th Cir. 2015) and *In re Tsikouris*, 340 B.R. 604 (Bankr.

N.D. Ind. 2006).  *See also, In re Luna*, 406 F3d 1192 (10th Cir. 2005) in which under similar facts

the court found for the debtor but on different grounds.

The Court finds the foregoing opinions to be well-reasoned and a correct application

of the teaching of *Davis* in the circumstances presented, as well as consistent with the District Court

holdings in *Lucci*, *Molinaro*, and *Jennings* as to the time when  unpaid contributions become plan

assets.  The Court further notes that the outcome reached in the cited cases is in harmony with two

other basic principles that are applicable here.

18

First is that, in keeping with the fresh start policy of bankruptcy, the denial of a

discharge is an extreme step not to be taken lightly, so that exceptions to discharge are to be

construed strictly against the creditor and liberally in favor of the debtor. *Shovlin v. Kass*, 555 B.R.

500, 507-08 (W.D. Pa. 2016) (citations omitted). Second, and as alluded to previously in this

discussion, is that the term "fiduciary capacity" in the context of *Section 523(a)(4)* is a narrow

concept. *See, e.g., In re Dombroski*, 478 B.R. 198, 202 (Bankr. M.D. Pa. 2012) (citing cases).[10]

As against the above, Plaintiff relies principally on *In re Fahey* , 482 B.R. 678 (1st

Cir. BAP 2012) whose facts are closely analogous to those of the present case. The Court has

carefully considered *Fahey* but does not find it persuasive. The *Fahey* court acknowledged the

relevance of *Davis* for determining the fiduciary capacity question under *Section 523(a)(4)*, *id*. at

688, however it then went on to find:

> Here, the ERISA plan, in the form of the Funds, predated the Debtor's
> failure to pay Contributions. Accordingly, the trust was in place when
> the alleged defalcation occurred.

*Id.* at 689. But as the court in *Hunter, supra*, noted, an individual who is not a party to a collective

bargaining agreement between a union and a corporate employer can only become subject to the

---

[10]

*See also*, Nicole Adalaide Griffin, *Fighting an Uphill Battle: Reconciling Unpaid
Contributions of Multiemployer Pension Plans with the Bankruptcy Code's Defalcation Provision*,
33 Emory Bankr. Dev. J. 313, 313 (2016) ("While the circuits deciding this issue outside of
bankruptcy interpret ERISA broadly, expanding the traditional understanding of what it means to
be a "fiduciary," the circuits deciding this issue within the bankruptcy context recognize fiduciary
status in very limited  circumstances and interpret the definition of "fiduciary" narrowly. In other
words, courts have been reluctant to impute fiduciary duties to employers when bankruptcy
proceedings accompany the otherwise identical factual scenarios.").

possibility of personal liability and a trust relationship for the corporation's failure to make an

employer contribution if and when the corporation fails to make the contribution – a "trust" that

springs from the act of wrongdoing and thus falls outside of *Section 523(a)(4)* under *Davis*. The

*Fahey* court does not explain how the prior existence of the ERISA plan changes that fact.

Additionally, it is worth noting that *Fahey* was a split decision, with the dissenting

judge commenting that:

> ... ERISA contains no express provision imposing breach of trust
> liability upon an individual who fails to make corporate employee
> benefit contributions. We should not invent trust fund liability where
> none exists to punish a bad actor when doing so could press an honest
> debtor into violating a long established fiduciary duty to all general
> creditors.

*Id*. at 697. In support of that point, the dissent also noted that ERISA is thus distinguishable from

the Internal Revenue Code, which <u>does</u> contain an express provision imposing breach of trust

liability upon an individual who fails to pay over withheld taxes. *See, 26 U.S.C. §§6672, 7501.* The

fact that ERISA lacks comparable provisions strengthens the conclusion that the Debtors in the

present case were not acting in a fiduciary capacity for purposes of *Section 523(a)(4)*.

The Court therefore concludes that there is no material factual issue in dispute as to

the plan asset and fiduciary capacity issues, and that: (1) the unpaid contributions did not become

plan assets until they came due; (2) any fiduciary status that the Debtors may have come under

pursuant to ERISA did not arise until the unpaid contributions became plan assets; and, (3) any such

fiduciary status of the Debtors under ERISA would not fall within the scope of "fiduciary capacity"

within the meaning of *Section 523(a)(4)* because it would have sprung from and not preexisted the

act of not paying the contributions.

Given those conclusions the Court will grant the *Debtors' Motions* and deny the *Plaintiff's Motion*. This result renders the issue of defalcation in the *Plaintiff's Motion* moot. However, for the sake of completeness the Court will state that even if it had ruled in Plaintiff's favor on the plan asset and fiduciary capacity issues it still would not have completely granted the *Plaintiff's Motion*. That is so because there would be factual issues in dispute going to the issue of whether any actions or failures to act by the Debtors constituted "defalcation" within the meaning of *Section 523(a)(4)*, as interpreted in *Bullock v. BankChampaign, N.A.* 569 U.S. 267, 269 (2013) where the Court reviewed the history of the term and held that it "includes a culpable state of mind requirement ... involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior."

The Plaintiff relies upon the fact that the Debtors used corporate assets to pay personal bills while employer contributions went unpaid, and seem to argue that doing so is *per se* defalcation. However, the Debtors characterize these payments as in reality being their compensation from the Company because they did not get any regular paychecks from it. Under Pennsylvania law, "there is nothing improper in the payment of reasonable salaries and fringe benefits to officers or directors of a corporation commensurate with the services they perform for the corporation." *Ferber v. Am. Lamp Corp.*, 503 Pa. 489, 495 (1983). Furthermore, corporations can be creative in the manner in which they compensate their corporate officers. Compensation to corporate officers does not have to be in the form of a paycheck and corporations can pay the personal expenses of their corporate officers so long as the corporation received fair consideration in return for the payments. *See, In re Main, Inc.*, 223 B.R. 457, 478 (Bankr. E.D. Pa. 1998), *aff'd*

21

*in part, vacated in part, rev'd in part.*   1999 WL 424296 (E.D. Pa. 1999).   Also, the person

questioning the reasonableness of the compensation has the burden of proving it is unreasonable.

*In re Allegheny Int'l., Inc.*, 131 B.R. 24, 29 (W.D. Pa. 1991).   Plaintiff has not met this burden for

purposes of a grant of summary judgment.

      An appropriate judgment order will be issued separately.

Dated: April 6, 2021
                       Thomas P. Agresti, Judge
                       United States Bankruptcy Court

      Case administrator to serve:
           Chief Judge Carlota M. Böhm
           Maribeth Thomas, Esq.
           Donald Calaiaro, Esq.
           Debtors